UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEOSERVE ENERGY TRANSPORT DMCC, | Case No.: 24-cv-2148-RSH-SBC |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S RULE 60 MOTION AND MOTION FOR LEAVE TO AMEND** |
| v. | |
| M/V 0 7 VEGA S, *in rem*, | [ECF No. 40] |
| Defendant. | |

Pending before the Court is a motion to set aside the judgment and for leave to file an amended complaint, filed by plaintiff Geoserve Energy Transport DMCC ("Plaintiff" or "Geoserve"). ECF No. 40. As set forth below, the motion is denied.

## I.    BACKGROUND

On November 15, 2024, Plaintiff filed its verified complaint in rem against the M/V 0 7 Vega S (the "Vessel"). ECF No. 1. The complaint alleges that Plaintiff is a company that provides fuel to ships. In October 2023, Plaintiff was contacted by Infinity Shipping FZCO ("Infinity FZCO") with a request that Plaintiff obtain fuel (also known as "bunkers") for the Vessel. *Id.* ¶¶ 4, 6. Plaintiff agreed to provide the fuel. *Id.* ¶ 5. Plaintiff then contracted with another company, Peninsula Petroleum Ltd. ("Peninsula"), which

physically furnished the fuel to the Vessel on October 10, 2023. *Id.* ¶ 22. Plaintiff invoiced Infinity FZCO for $188,254 for the fuel. *Id.* ¶ 23. Infinity FZCO effected timely payment for the fuel provided to the Vessel; but shortly after paying, Infinity FZCO advised Plaintiff that the amount recently paid for the Vessel should instead be re-applied to the account of a different vessel, the "T Rigel," for which Plaintiff had also procured fuel. *Id.* ¶ 25. Following discussions with Plaintiff, Infinity FZCO later made partial payment to Plaintiff in the amount of $20,000, but never re-paid in full the remainder of the $188,254. Plaintiff's complaint brought claims against the Vessel in rem based on an asserted maritime lien, for breach of contract, and for recovery in quantum valebant.

On November 17, 2024, Plaintiff filed an ex parte application for a warrant for the arrest of the Vessel. ECF No. 2. The following day, the Court ordered the issuance of a warrant, and the Vessel was arrested pursuant to that warrant. ECF Nos. 4, 7.

On November 21, 2024, Infinity Shipping & Trading LLC ("Infinity")—the entity that the Parties agree made the initial payment to Plaintiff—filed an ex parte application for an order vacating the arrest and releasing the Vessel, or alternatively setting a hearing to determine the amount of security to be posted for the release of the Vessel pursuant to Supplemental Admiralty Rule E(5). ECF No. 10. The same day, Ocean7, the time charterer of the Vessel, filed a joinder to Infinity's motion, seeking the same relief. ECF No. 11. The Court immediately scheduled a hearing on Infinity's motion for November 25, 2024. ECF No. 12.

Earlier on the day of the November 25, 2024 hearing, Ocean7 filed an additional brief. ECF No. 15. That brief presented evidence that the transaction at issue involved additional parties not mentioned in the verified complaint. Specifically, Ocean7's broker, Moxie Brokerage ("Moxie"), placed an order for fuel with a company called TSL Shipping ("TSL"), which in turn sub-contracted with Infinity, which in turn sub-contracted with Plaintiff, which in turn sub-contracted with Peninsula, the party that physically provided the fuel to the Vessel. ECF No. 15 at 9. Ocean7 submitted documentation relating to the original fuel transaction – Moxie's order of fuel from TSL – which gave rise to the

subsequent transactions, including the order in which Plaintiff served as a fuel trader. ECF No. 15-1 at Exs. A to E. Plaintiff's verified complaint had omitted to mention Ocean7, Moxie, or TSL; instead, it alleged in conclusory terms that Infinity FZCO "had authority to procure [fuel] for the Vessel as an agent appointed by the owner, charterer, or owner pro hac vice." ECF No. 1 ¶ 7.

The evidence presented by Ocean7 not only shed light on the other parties involved in the chain of transactions, but also reflected that Plaintiff was aware of those other parties before filing its in rem lawsuit against the Vessel. In email correspondence from February 2024, Plaintiff's representative wrote to Moxie in connection with Plaintiff's claim against Infinity FSZO for unpaid fuel, asking if there was anything Moxie could do to facilitate payment. ECF No. 15-1 Ex. E. Plaintiff's representative added, "[w]e now see this as a great opportunity to get to know a potential customer – dealing with us for the unpaid supply would have cut out at least 2 layers of bunker trader!" – apparently referring to TSL and Infinity being intermediate traders. *Id.* Moxie forwarded Plaintiff's inquiry to TSL, which responded that TSL had received full and timely payment for the fuel from Moxie, and that TSL had in turn made full and timely payment for the fuel to Infinity. *Id.* TSL continued, "We are stunned to see Infinity instructing these funds to be allocated to another vessel than the O7 Vega S …. We have no knowledge or involvement with the T Rigel, and there is absolutely no connection with the O7 Vega S." *Id.*[1]

Based on the evidence adduced, Ocean7 argued in its brief that: (1) any maritime lien on the Vessel would exist in favor of TSL, the entity that originally contracted with

---

[1]      Similar to the verified complaint, Plaintiff's emergency motion for an arrest warrant mentioned none of this. Instead, that motion represented that Plaintiff had a maritime lien on the Vessel because the Vessel's owners or charterers had failed to pay: "As a result of the Defendant Vessel (and its owners/operators/charterers') failure to pay the amounts owed to Plaintiff for the "necessaries" provided to the M/V 0 7 VEGA S, Plaintiff's claim in the amount of USD $168,254.78 attaches as a maritime lien on the said Vessel as set forth in the Maritime Lien Act." ECF No. 2 at 5.

Ocean7's broker, rather than favoring downstream traders or subcontractors such as Plaintiff;[2] and (2) to the extent a valid maritime lien existed, it would have been extinguished upon TSL's receipt of payment from Ocean7's broker, and would not somehow regenerate the moment that Infinity FZCO asked Plaintiff to reallocate the payment previously made. Ocean7 argued that there had been no basis to arrest the Vessel, and that any claims Plaintiff might have for unpaid fuel furnished to the Vessel would be in personam claims against Infinity FZCO rather than in rem claims against the Vessel justifying the Vessel's continued arrest. In other words, a dispute between subcontractors regarding the reallocation of a full payment already indisputably made was not a matter that should properly result in detention of the Vessel.

During the November 25, 2024 hearing, the Court advised Plaintiff's counsel that Ocean7's brief filed earlier that day gave the Court concern that the arrest of the Vessel was unsupported by probable cause. ECF No. 38 (Tr. of Nov. 25, 2024 Hrg., at 25:2-26:3). The Court granted Plaintiff's request for additional time to file a supplemental brief in advance of a continued hearing. ECF No. 18.

Before the conclusion of the November 25, 2024 hearing, the Parties—Plaintiff, Infinity, and Ocean7—agreed to the posting of security and release of the Vessel, and jointly moved for an order releasing the Vessel. ECF No. 18. The following morning, November 26, 2024, the Court issued a written order granting the joint motion and releasing the Vessel. ECF No. 17. The Vessel was released by the U.S. Marshals Service the same day. ECF No. 20. Thereafter, Plaintiff filed a supplemental brief. ECF No. 22.

Because Infinity's original motion sought, as alternative relief, the setting of an amount of security "to secure the release of the Vessel," ECF No. 10 at 3—and because

---

[2] *See, e.g.*, *ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 519 (2d Cir. 2018) (holding that a "subcontractor[] [was] not entitled to a maritime lien because it provided the bunkers at the direction of [a bunker trader] rather than at the direction of the owner or the charterer of the Vessel, or any other statutorily authorized person.").

subsequent to the filing of that motion, an amount of security was agreed to and the Vessel was released—the Court denied Infinity's motion as moot. ECF No. 23.

On December 12, 2024, Ocean7 filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative to vacate the maritime arrest and dismiss the action pursuant to Supplemental Admiralty Rule E(4)(f). ECF No. 28. Plaintiff's opposition was due on January 2, 2025. Plaintiff did not file an opposition. On January 3, 2025, Ocean7 filed a reply brief. ECF No. 31. Later that day, the Court granted Ocean7's motion, dismissing the complaint without leave to amend, vacating the maritime arrest, and closing the case. ECF No. 32. The Court's dismissal order was based not only on Plaintiff's failure to oppose, but on the merits as well. *Id.* The Court explained:

> Plaintiff's Complaint fares no better on the merits. The Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31342(a), is the statutory basis for the creation of maritime liens and for Plaintiff's claim. CIMLA provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel [and] may bring a civil action in rem to enforce the lien . . . ." *Id.* CIMLA requires three elements for a maritime lien: (1) that the goods or services at issue were "necessaries," (2) that the entity "provid[ed]" the necessaries to a vessel; and (3) that the entity provided the necessaries "on the order of the owner or a person authorized by the owner." CIMLA defines "persons . . . presumed to have authority to procure necessaries for a vessel" as "(1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by—(A) the owner; (B) a charterer; (C) an owner pro hac vice; or (D) an agreed buyer in possession of the vessel." 46 U.S.C. § 31341(a). Here, the Complaint alleges that Infinity ordered bunkers from Plaintiff, and alleges that on information and belief, "Infinity acted as a back-to-back bunker trader … and in that capacity had authority to procure bunkers for the Vessel as an agent appointed by the owner, charterer, or owner pro hac vice." ECF No. 1 ¶ 7. Ocean7 contends that this allegation is conclusory, and that the Complaint does not plausibly allege facts supporting the conclusion. The Court agrees. The Complaint does not allege any facts establishing that Infinity was an agent appointed by Ocean7, as opposed to being (for example) a subcontractor to TSL. Indeed, evidence in the record indicates that

Plaintiff was aware before filing this lawsuit that there were at least two levels of traders between Plaintiff and the charterer's broker. ECF No. 15-1 at Ex. G (email from Plaintiff's credit risk manager to Ocean7's broker: "We also see this as a great opportunity to get to know a potential customer – dealing with us for the unpaid supply would have cut out at least two layers of bunker trader!").

Additionally, the Complaint alleges that "[o]n or about November 7, 2023, Infinity sent a payment to Geoserve with a subsequent message advising Geoserve that the payment should be applied to Geoserve's supply of bunkers [to a different vessel], for which Infinity also engaged Geoserve." ECF No. 1 ¶ 25 & Ex. 5 (email correspondence reflecting payment). Ocean7 has argued that payment would have extinguished any lien, and that a downstream party who thereafter seeks to "reallocate" such payment does not thereby "resurrect" a lien. ECF No. 28-1 at 21-22. The Court agrees. *See World Fuel Servs. v. Magdalena Green M/V*, 464 F. App'x 339, 341 (5th Cir. 2012) ("Where, as here, the debt is repaid and satisfaction is acknowledged, the lien ceases to exist.").

In light of the Complaint's deficiencies, it fails to state a claim as to any of its asserted causes of action. *See also Equatorial Marine Fuel Mgmt. Servs. PTE v. MISDC Berhad*, 591 F.3d 1208, 1211 (9th Cir. 2010). ("But these documents, which were never sent to [bunker purchaser], don't show that [purchaser] was even aware that Equatorial was the bunker supplier, let alone that it entered into a contract with Equatorial. At most, these documents show that Equatorial thought it was contracting with [purchaser]. But contracting, like dancing the tango, takes two; one party's belief that there was an agreement isn't enough.").

Plaintiff has neither amended its Complaint nor sought leave to amend. Based on the Court's familiarity with the factual record in connection with the Parties' briefing on Infinity's initial motion to vacate, the Court concludes that amendment would be futile. Plaintiff's supplemental brief, filed after the November 25, 2024 hearing, did not adequately address the factual concerns the Court articulated at the hearing, which concerns are addressed above as a matter of pleading. Plaintiff intimates that TSL and Infinity are related entities, ECF No. 21 at 2, which Ocean7 disputes, ECF No. 28-1 at 24. However, as Ocean7 points out, even if this were true it would not confer a lien on

Plaintiff. Plaintiff's supplemental brief did not meaningfully address Ocean7's argument that any lien was extinguished upon payment.

As to Ocean7's request to vacate the arrest order, as discussed above, the evidence presented—which Plaintiff has not controverted—indicates that Ocean7's broker contracted with TSL, and not Plaintiff, for the supply of fuel; and that Ocean7 made payment to TSL, extinguishing any lien. Plaintiff has the burden of justifying the continuation of the arrest warrant. *See Equatorial Marine*, 591 F.3d at 1211 ("[I]n order to justify the continued attachment of [bunker purchaser's] property, [bunker supplier] had the burden of showing that it had a valid prima facie breach of contract or unjust enrichment claim."). Plaintiff has not met that burden. Accordingly, the Court's previously issued arrest warrant, which is currently directed to the security as substitute res, is vacated.

In light of the dismissal of the Complaint without leave to amend, and the vacatur of the arrest warrant, this in rem action is properly dismissed.

ECF No. 32 at 4-6. Judgment was entered the same day. ECF No. 33.

On January 7, 2025, Ocean7 filed a motion to require Plaintiff to post countersecurity. ECF No. 34. The Court has denied that motion. ECF No. 44.

On January 29, 2025, Plaintiff filed its present motion to set aside judgment and for leave to file an amended complaint. ECF No. 40. The motion has been fully briefed. ECF Nos. 43 (opposition), 45 (reply).

## II.    ANALYSIS

Plaintiff's motion first asks the Court to set aside the judgment and the Court's dismissal order on grounds of "excusable neglect" pursuant to Federal Rule of Civil Procedure 60(b)(1). Plaintiff asserts that its failure to timely respond to Ocean7's motion to dismiss "was the result of Plaintiff's counsel's inadvertence or mistake in failing to ensure his legal assistant calendared the response deadline, and, exacerbated by severe illness, failing to recall or appreciate the deadline, and consequently failing to timely submit a response." ECF No. 40-1 at 6. Plaintiff submits an attorney declaration describing

the nature of the error as well as the lead counsel's illness with flu. ECF No. 40-2.

In opposing Plaintiff's Rule 60 motion, Ocean7 argues that Plaintiff's explanation is inadequate, in that Plaintiff is represented by two law firms and five attorneys in this matter; and that a single attorney becoming ill with flu does not explain, let alone excuse, Plaintiff's failure to respond. ECF No. 43 at 2-3. Plaintiff's reply brief does not undertake to explain why other members of Plaintiff's legal team could not have complied with the required deadlines. The Court agrees with Ocean7. Plaintiff was represented at the November 25, 2024 hearing by two attorneys: its lead counsel and an associate attorney whose conduct toward chambers staff on a previous date—in seeking to ensure that the Court ruled on Plaintiff's emergency motion within less than one business day of its filing—resulted in the attorney being escorted away by court security. *See* ECF No. 38. All of Plaintiff's attorneys of record are responsible for meeting deadlines in this case. Because Plaintiff declines to address this for any attorney except for lead counsel, the Court finds that Plaintiff has not carried its factual burden of establishing "excusable neglect," a precondition for granting the relief that Plaintiff seeks.[3]

Even if the Court were to set aside the judgment, the fact remains that the Court previously dismissed Plaintiff's complaint on the merits. Plaintiff's motion does not directly address that part of the Court's ruling. Instead, Plaintiff seeks leave to file an amended complaint. Plaintiff invokes Federal Rule of Civil Procedure 15(a)(2), which

---

[3]    To determine whether neglect is excusable, Courts examine at least four factors: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Lemoge v. United States*, 587 F.3d 1188 (9th Cir. 2009) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs., Ltd.*, 507 U.S. 380, 395 (1993)). The information provided by Plaintiff is insufficient for the Court to conclude that the third or fourth factors favor relief. Additionally, as set forth further below, Plaintiff has not demonstrated that, were the Court to set aside the judgment, Plaintiff could cure the substantive deficiencies that resulted in dismissal of the complaint. Under these circumstances, setting aside the judgment would result in prejudice to Ocean7 by unduly and unnecessarily protracting the proceedings.

provides that a court "should freely give leave when justice requires."

To determine whether to grant leave to amend, courts generally consider the five factors the Supreme Court established in *Foman v. Davis*, 371 U.S. 178 (1962): (1) undue delay, (2) the movant's bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party, and (5) futility. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020). A court need not grant leave to amend where amendment would be futile. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (2d Cir. 1987).

The Court determines that granting Plaintiff leave to file its proposed amended complaint, *see* ECF Nos. 40-4 (redline), 40-5 (clean copy), would be futile here. Indeed, the Court previously denied leave to amend upon finding that amendment would be futile. Plaintiff does not address that part of the Court's ruling either.

The Court's dismissal order stated, "the evidence presented—which Plaintiff has not controverted—indicates that Ocean7's broker contracted with TSL, and not Plaintiff, for the supply of fuel; and that Ocean7 made payment to TSL, extinguishing any lien." ECF No. 32 at 6. Yet the only reference to TSL that Plaintiff makes in its motion is as follows: "Geoserve came to believe" that the individual who "owns and/or controls" Infinity and Infinity FZCO also "owns and/or controls" TSL, "with TSL acting as Ocean7's booking agent." ECF No. 40-1 at 15-16.[4] First, what Plaintiff "came to believe" is immaterial. Second, these assertions about TSL are vague and conclusory. Plaintiff's proposed amended complaint is likewise conclusory.[5] Plaintiff has not adequately pleaded facts

---

[4]    Plaintiff's reply brief does not mention TSL.

[5]    Plaintiff's proposed amended complaint alleges that "the Infinity Defendants and the other Soendergaard Companies are either joint venturers, alter egos and/or authorized agent(s) of the owners and/or Ocean7 and conspired with Ocean7 to distance owners, Ocean7, and the Vessel from the Geoserve order, relying on Geoserve's good credit to have the bunkers delivered to the Vessel and failing to pay for them." ECF 40-5 ¶ 15. The proposed amended complaint also asserts that the numerous links in the supply chain were

plausibly establishing that TSL was an alter ego of Ocean7 or acted as Ocean7's agent in connection with the fuel transaction at issue, much less rebutted Ocean7's evidence.

The Court also determined, as an alternative basis for dismissal, that any maritime lien for the fuel at issue would have been extinguished when Ocean7 made payment to TSL. ECF No. 32 at 6. Plaintiff's motion also ignores this argument.[6]

Finally, the Court's order of dismissal also determined that, the arrest having been vacated, there was no longer a basis for maintaining an in rem action against the Vessel. Plaintiff's motion does not appear to address this alternative basis for dismissal either. Plaintiff cites a district court decision to argue for the Court's continuing jurisdiction. ECF No. 40-1 at 12, ECF No. 45 at 8-9 (citing *Capital Bank PLC v. M/Y Birgitta*, No. CV 08-5893 PSG, 2009 WL 10655215 (C.D. Cal. Sept. 16, 2009), but that case did not involve an

---

"sham transfers" and were "employed … to paper the transaction and distance the [fuel] order from the Vessel." ECF No. 40-5 ¶¶ 11, 13. These conclusory allegations are not adequately pleaded. *See Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) ("(1) courts need not accept as true legal conclusions or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;' and (2) only a complaint that states a plausible claim for relief with well-pleaded facts demonstrating the pleader's entitlement to relief can survive a motion to dismiss.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)).

The conspiracy that Plaintiff now alleges is a bizarre one indeed. Plaintiff appears to allege that the Vessel's owners, the Vessel's charterer, and two or more layers of upstream contractors all conspired to engage in a series of sham transactions that resulted in ordering fuel from Plaintiff—*and then paid Plaintiff in full* for that fuel, before asking Plaintiff to reassign that payment to amounts owed for a different vessel, and thereafter making partial re-payment to Plaintiff for the original fuel order. The Court questions whether these allegations of conspiracy are made in good faith—especially where the verified complaint as well as Plaintiff's emergency motion for an arrest warrant omitted any mention of numerous other parties (now alleged to be conspirators) that Plaintiff well knew were involved in the fuel procurement.

[6] Indeed, even if it were *Plaintiff* rather than TSL that held the maritime lien, that lien would at least arguably have been extinguished the moment that Plaintiff was paid in full for the fuel. Plaintiff never explains why such a lien would thereafter automatically spring back to life, the moment Infinity requested that that payment be attributed to the account of a different vessel.

10

arrest that had been vacated by the Court.

The Court declines to exercise its discretion to allow Plaintiff leave to amend. In addition to concluding again that leave to amend would be futile, the Court determines that Plaintiff has failed to adequately address the deficiencies and concerns previously identified by the Court. These omissions in Plaintiff's motion, including where Plaintiff has apparently ignored dispositive elements of the Court's dismissal order, give rise to an inference of dilatory motive. In such circumstances permitting leave to amend would needlessly protract the litigation and result in prejudice to Ocean7 in having to raise the same arguments for the third time.

The Court notes that while the original complaint was brought in rem against the Vessel, the proposed amended complaint also includes in personam claims against an individual and two corporate entities. The Court's denial of leave to amend does not prevent Plaintiff from pursuing those putative claims in a separate lawsuit.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion [ECF No. 40] is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 5, 2025

_Robert S Huie_

Hon. Robert S. Huie
United States District Judge

24-cv-2148-RSH-SBC